IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| MARGARITA JUAREZ,<br><br>Plaintiff,<br><br><br><br><br>vs.<br><br><br>STATE OF UTAH DEPARTMENT OF HEALTH - FAMILY DENTAL PLAN, ANDREA HIGHT, and ERICA VEKTER,<br><br>Defendants. | ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE PLAINTIFF'S AFFIDAVIT<br><br><br><br><br>Case No. 2:05CV0053PGC |

In this Title VII case, the defendants, the Department of Health of the State of Utah and the Family Dental Plan (collectively, "Family Dental"), move for summary judgment on all of plaintiff Margarita Juarez's claims—retaliation, disparate impact, *quid pro quo* sexual harassment, and hostile work environment based on race and gender.  Family Dental also moves to exclude or strike the affidavit Juarez submitted in conjunction with her Opposition to Defendant's Motion for Summary Judgment.  The court grants Family Dental's motion to exclude Juarez's sham affidavit and grants Family Dental's motion for summary judgment in full.

# BACKGROUND

When considering a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party.[1]  Viewed in this light, the record reflects the following facts.

Juarez, an Hispanic female, began working for Family Dental as a Dental Assistant II in October 2004.  Family Dental is a dental facility organized by the State of Utah, with multiple clinics, at least one of which is located in Salt Lake City.  Andrea Hight, a Family Dental manager, originally hired Juarez.  Mark Palmer occupied the position of Juarez's direct supervisor and assigned Juarez her duties, and it was Palmer who authorized Juarez to travel on mobile dental missions.  Hight initially hired Juarez as a Dental Assistant II, a position Juarez retained at all relevant times.

In December 2005, Juarez traveled to Enterprise, Utah, on a mobile dental mission for Family Dental.  Dr. David Schlotman accompanied her on the trip.  On January 19, 2004, Palmer authorized Juarez to travel on another mobile dental mission.  Schlotman again accompanied her; this time the pair traveled to Bicknell, Utah.  Juarez and Schlotman returned to Salt Lake City on January 23, 2004.

Family Dental employed Schlotman as a dentist and as Juarez's co-worker.  Schlotman possessed no power to make tangible employment decisions relating to Juarez.  Juarez knew the dentists at Family Dental had no supervisory authority over her, and no one ever told Juarez anything to the contrary.  Despite this, Juarez claims she thought Schlotman was her supervisor

---

[1]*See Cortez v. McCauley*, 438 F.3d 980, 988 (10th Cir. 2006).

in Bicknell, by virtue of the fact that she and Schlotman traveled with no management personnel present.

On January 28, 2004, Schlotman lodged a complaint with Family Dental management personnel alleging Juarez made sexual advances toward him during the trip to Bicknell. Specifically, he contended Juarez put her arms around his neck, kissed him, and said she wanted to spend "eternity" with him.[2]  Hight, a member of Family Dental's management, and Palmer, Juarez's direct supervisor, confronted Juarez about Schlotman's allegations on January 29, 2004. During this confrontation, Hight requested Juarez wait to contact an attorney until after Family Dental completed an internal investigation.  Juarez denied Schlotman's allegations, but did not otherwise respond to the inquiry at this time.

On January 30, 2004, Juarez reported to Palmer that Schlotman had sexually harassed her on the trip to Bicknell by offering her $100 in exchange for sex, which she had refused.  Palmer informed Hight of Juarez's complaint, and Hight notified Family Dental's Human Resources Department, just as she had with Schlotman's complaint.  In her report to Palmer, Juarez provided details about Schlotman's offer of money for sex, but did not provide details about the return trip to Salt Lake.

Taking the facts in the light most favorable to the plaintiff, the court finds the events in Bicknell occurred as follows.  (Of course, the participants other than the plaintiff may dispute this account.)  On January 22, 2004, Juarez and Schlotman accompanied each other to dinner. On the way back to the hotel, Schlotman offered Juarez $100 in exchange for sex.  Specifically,

---

[2]Family Dental Memo. in Support of Sum. Judg., Docket No. 59, Ex. B, at 60 (June 6, 2005) (Affidavit of Shelley Miles).

he pulled a $100 bill out of his wallet, showed it to Juarez, and told her it was hard to find change for a large bill in a rural area.  "He then said he was paying that amount to women to follow him to his room to have sex with him."[3]  Juarez only responded that she wanted to return to her room to rest.  Schlotman answered, "Okay, that's okay."[4]  Then Juarez walked back to her room.

The next day, on the return trip to Salt Lake, Schlotman seemed angry.  He told Juarez that if he were her, he would return to El Salvador.  He pointed out a billboard sign addressing the cost of illegal immigration to Utahans.  Schlotman then called "all women" prostitutes and picked a dog up from Juarez's lap and threw it to the back of the car.[5]

On February 4, 2004, Juarez contacted Hight about Family Dental's investigation of the competing sexual harassment complaints.  During the course of the conversation, Juarez quit her job with Family Dental.  Hight asked her to reconsider that decision and to call her back.  After Juarez changed her mind about ending her employment with Family Dental, Hight welcomed her back.

On February 18, 2004, Juarez told Hight of the results of her online research on Schlotman.  Specifically, she told Hight the Division of Occupational and Professional Licensing ("DOPL") previously investigated Schlotman and he was only allowed to practice dentistry under the direct supervision of a licensed dentist.  She also told Hight about Schlotman's history of

---

[3]Family Dental Memo. in Support of Sum. Judg., Docket No. 59, Ex. A, at 44 (June 6, 2005) (Margarita Juarez Examination Under Oath).

[4]*Id.*

[5]Juarez Memo. in Opposition to Sum. Judg., Docket No. 66, Ex. D, at 52, 61 (July 14, 2006) (Margarita Juarez Examination Under Oath).

domestic violence.  The parties dispute whether Hight responded that she already knew only of Schlotman's DOPL history or she knew of Schlotman's entire history.  Taken in the light most favorable to the plaintiff, the court assumes Hight responded that she knew of Schlotman's entire history.  Before speaking with Hight about the matter, Juarez had discussed Schlotman's history and the details of her complaint against Schlotman with another dentist, Dr. Sumner.  Upon hearing of this, Hight and Shelley Miles cautioned Juarez about the need to keep the investigation confidential.  Hight and Miles advised Juarez discussing Schlotman's history with others could be seen as retaliation for Schlotman's sexual harassment complaint against Juarez, and Juarez's job would be in jeopardy if she failed to keep the information confidential.

On February 25, 2004, Hight told Juarez she would have to work with Schlotman one-on-one again sometime.  However, Juarez never actually did work with Schlotman again.  From February 11 to February 13, 2004, Schlotman was scheduled to see patients at the Salt Lake clinic.  To prevent Juarez from seeing Schlotman, Family Dental temporarily transferred Juarez from the Salt Lake clinic to the Ellis Ship clinic on those dates.  Juarez did not view the transfer as harassment.  To further accommodate Juarez's desire to avoid Schlotman as well as to facilitate her ability to seek medical treatment, Family Dental allowed Juarez to take medical leave from February 24 to February 29, 2004.  On February 24, 2004, while on medical leave, Juarez filed a complaint with DOPL. On March 3, 2004, DOPL contacted employees at Family Dental about Juarez's complaint.

Subsequently, a few employees withdrew from Juarez, decreasing their interactions with her.  Specifically, Sylvia Case, a co-worker, stopped talking with Juarez as much as previously.  Case worked at the Ellis Ship clinic, so Juarez did not see her often but she had previously acted

friendly when Juarez saw her.  After the Bicknell trip, one day Juarez worked at the Ellis Ship

clinic when Case made a comment about dental assistants going to dinner with dentists and asked

Juarez if she had fun on the trip to Bicknell.  Palmer also withdrew from Juarez by talking with

her less and speaking with other dental assistants more.  However, Palmer never refused to speak

with Juarez about her job or job duties.  Palmer observed "[t]here was definitely a difference" in

how Juarez was treated following her complaint,[6] but clarified that the difference was partly

based on Juarez's own behavior.  Palmer did not ever "observe anything that was ill will or

purposefully trying to avoid her."[7]   When Juarez complained to Palmer fellow employees were

pulling away and treating her coldly, he responded by saying, "that's okay, that's the way how

things are going to be after DOPL has set foot in here."[8]

Juarez also had problems with a few other Family Dental employees.  Joe Guimond, a

technician, monitored Juarez's work, followed her around the office and out to her car, pushed

her against the wall, and implied she should quit her job.  Also, at an unspecified time, Dr. Erika

Vekter told Juarez her claim would not be believed because of her race.  On another occasion,

Hight questioned Juarez about her accent and her background.  Both Hight and Vekter told

Juarez she needed to improve her English skills.  And, based on licensing concerns, the dentists

---

[6]Family Dental Memo. in Support of Sum. Judg., Docket No. 59, Ex. D, at 57 (June 6, 2005) (Mark Palmer Examination Under Oath).

[7]*Id.* at 58.

[8]Family Dental Memo. in Support of Sum. Judg., Docket No. 59, Ex. A, at 142 (June 6, 2005) (Margarita Juarez Examination Under Oath).

at Family Dental collectively wrote letters of concern to Family Dental management and to DOPL.

In the meantime, on March 11, 2004, Family Dental placed both Juarez and Schlotman on paid administrative leave, pending completion of its internal investigation.  Schlotman never returned to work at Family Dental.  He submitted his resignation letter, dated March 22, 2004, and Family Dental terminated his employment effective March 23, 2004.  On March 26, 2004, Family Dental informed Juarez she could return from administrative leave.  She returned to work on March 29, 2004.

On May 18, 2004, Family Dental concluded its internal investigation and notified Juarez of this fact via letter.  Due to lack of evidentiary support, Family Dental did not substantiate either Schlotman's or Juarez's claim of sexual harassment.  On July 14, 2004, Juarez filed a Charge of Discrimination with the Utah Anti-Discrimination Division and the United States Equal Opportunity Employment Commission, alleging Family Dental discriminated against her on the basis of her race, origin, color, and sex, in violation of Title VII.  She also alleged Family Dental had retaliated against her for lodging a sexual harassment complaint against Schlotman and a DOPL complaint against Schlotman and Family Dental.  In this document, Juarez referred to Schlotman as her co-worker.

Upon her return from administrative leave on March 29, 2004, Juarez believed she had been deprived of some of her supervisory duties and that she had a new job performance plan. She asked Palmer if she retained her supervisory duties, and he responded that her job duties had not changed at all and that she still occupied the position of Dental Assistant II.  Juarez's job included a class of duties referred to as "runner," as in running the clinic (not, as is sometimes

the case in other professions, running around on errands).  Upon her return from leave, Juarez

worked in this running capacity, but also worked as a chairside assistant more than one time a

week.  Juarez often assigned herself as the runner because it allowed her to oversee work

operations better and she felt more productive in that position.  Employees qualified as Dental

Assistant I's generally perform chairside assisting duties and occasionally expanded duties, but

they cannot act as runners.  Running is an essential function of Dental Assistant II's because

Dental Assistant II's possess extra skills and abilities.  For this same reason, Dental Assistant II's

earn a higher rate of pay.

 Family Dental cross-trains all their dental assistants as front-desk receptionists so they

can fill in when needed.  At one point after her return from administrative leave, Palmer offered

Juarez a position as a front-desk receptionist, but Juarez refused and never took the position.

During this same general time period, Juarez's job title stopped appearing on her pay stubs.

Palmer explained to Juarez a computer problem led to the omission.  Many state employees' pay

stubs lacked job titles during the same time period.

 Family Dental official policies prohibit employees from leaving for lunch wearing scrubs,

parking in front of the building, using the front door of the clinic, and using their cellular phones

in the office.  Although Family Dental enforced none of these policies regularly before Juarez left

for administrative leave, upon her return, Family Dental reminded Juarez of the policies.  A few

days later, Family Dental management reminded all other employees of the same policies.

 Beginning in February 2004, Juarez sought psychiatric help.

 Throughout the course of Juarez's employment, Family Dental never decreased Juarez's

pay or benefits and never subjected her to discipline or demotion.  Other than the brief period on

February 4, 2004, in which she quit, Juarez remained employed as a Dental Assistant II at all times relevant to this action.

## DISCUSSION

### I.  Standard of Review

The court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[9]  In determining the appropriateness of summary judgment, the court must "view the evidence, and draw reasonable inferences therefrom, in the light most favorable to the non-moving party."[10]  However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to overcome a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the plaintiff."[11]

### II.  Motion to Exclude Plaintiff's Affidavit

In addition to filing a motion for summary judgment, the defendant has moved to exclude the affidavit of Juarez that plaintiff's counsel filed in opposition to the defendant's motion for

---

[9]Fed. R. Civ. P. 56(c).

[10]*Combs v. PriceWaterhouse Coopers, LLP*, 382 F.3d 1196, 1199 (10th Cir. 2004).

[11]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

summary judgment.  The court grants this motion on the basis Juarez has filed a sham affidavit in order to create an issue of material fact.

In determining whether a genuine issue of material fact exists for summary judgment purposes, an affidavit will not necessarily be precluded simply because it contradicts the affiant's previous sworn statements.[12]  The Federal Rules of Civil Procedure allow non-material changes to deposition testimony.[13]  Material changes may also be permissible if they satisfy the test adopted in *Burns v. Board of County Commissioners*[14] and *Franks v. Nimmo*.[15]  Changes to prior deposition testimony will not satisfy this test if the changes constitute an attempt to create sham fact issues.  Relevant factors in assessing the existence of a sham affidavit include: (1) whether the party was cross examined when giving the prior sworn statement, (2) whether the contested evidence was newly-discovered or whether the party had access to the evidence at the time of the previous testimony, and (3) whether the contested evidence attempts to explain confusion the earlier testimony reflected.[16]  A change is material if it bears on an essential element of a claim or a defense.[17]

---

[12]*Burns v. Bd. of County Comm'rs*, 330 F.3d 1275, 1281 (10th Cir. 2005).

[13]*See* Fed. R. Civ. P. 30(e).

[14]330 F.3d 1275, 1282.

[15]796 F.2d 1230, 1237 (10th Cir. 1986); *see also Jackson v. Kan. County Ass'n Multiline Pool*, 2006 U.S. Dist. LEXIS 20881, *11 (D. Kan. Apr. 10, 2006); *Summerhouse v. HCA Health Servs.*, 216 F.R.D. 502, 508 (D. Kan. 2002).

[16]*Franks*, 796 F.2d at 1237; *see also Burns*, 330 F.3d at 1282 (utilizing the same test).

[17]*Adler v. Wal-Mart Stores, Inc.*, 144 F3d. 664, 670 (10th Cir. 1998).

The Tenth Circuit has articulated the basis for this approach: "the utility of summary judgment as a procedure for screening out sham fact issues would be greatly undermined if a party could create an issue of fact merely by submitting an affidavit contradicting his own prior testimony."[18]  If Rule 30(e) were interpreted to allow individuals to alter the statements they made under oath, "one could merely answer the questions with no thought at all then return home and plan artful responses.  Depositions differ from interrogatories in that regard.  A deposition is not a take home examination."[19]

In this case, Juarez's affidavit seems more like a belated attempt to create an issue of material fact by laundering Juarez's deposition testimony than a simple, nonmaterial clarification of her testimony.  In her deposition, Juarez either failed to mention or directly contradicted many of the essential claims in her affidavit—in short, the affidavit differs substantially from the deposition.  A few examples of inconsistencies follow.  In her affidavit, Juarez indicated she asked Palmer for an explanation after her job title stopped appearing on her pay stubs and he told her she was not entitled to any proof as to why her job title did not appear, without a subpoena.  Yet in her deposition, Juarez admitted Palmer explained a computer problem caused the omission of her job title.  In her affidavit, Juarez claimed Hight told her she "had no right to counsel until after the internal investigation had concluded."[20]  Yet in her deposition, Juarez explained Hight told Juarez she could contact legal counsel, then simply asked Juarez not to do

---

[18]*Franks*, 796 F.2d at 1237.

[19]*Garcia v. Pueblo Country Club*, 299 F.3d 1233, 1242 (10th Cir. 2002) (citation and quotations omitted).

[20]Juarez Affidavit in Opposition to Sum. Judg., Docket No. 67, at ¶ 1 (July 14, 2006).

so until after the internal investigation was completed.  In her affidavit, Juarez claimed she had to

work with Schlotman after she made her sexual harassment complaint.  Yet in her deposition,

Juarez clarified she was only *told* she would have to work with him—not that she actually did

have to work with him.  The court finds the changes to the deposition testimony of Ms. Juarez to

be material to the issues at hand.

　　　　Further, the court concludes Juarez's affidavit constitutes a sham affidavit because it

meets each of the elements set out in *Franks* and *Burns*.  In *Jackson v. Kansas County Ass'n*

*Multiline Pool*, the court applied *Burns* and found the plaintiffs had submitted sham affidavits.[21]

The court based its decision on the fact the plaintiffs were subject to cross-examination during

their depositions, even though counsel failed to cross-examine them.[22]  Also, the plaintiffs'

affidavits did not reflect newly-discovered evidence and the depositions did not reflect

confusion.[23]  The plaintiffs waited to execute their affidavits until just before they responded to

the defendants' motion for summary judgment, and the affidavits contradicted their deposition

testimony.[24]  For similar reasons, in *Cubie v. Bryan Career College*, the court supported its

previous decision to strike the plaintiff's late-filed affidavit.[25]  Additionally, the court found it

significant that counsel asked the plaintiff about the central issues in the case multiple times and

---

[21]2006 U.S. Dist. LEXIS 20881, *12 (D. Kan. Apr. 10, 2006).

[22]*Id.*

[23]*Id.*

[24]*Id.*

[25]2003 U.S. Dist. LEXIS 7326, *6 (D. Kan. Apr. 23, 2003).

the plaintiff had ample opportunity to clarify her testimony while being deposed.[26]  Discounting the plaintiff's explanation for filing the affidavit, the court observed that it could "[]not imagine a party who is not nervous during a deposition."[27]

Similarly, in this case, Juarez's counsel was present while Juarez was being deposed, so she was subject to cross-examination.  Counsel's failure to take advantage of the opportunity to cross-examine Juarez does not defeat this prong of the test.  To hold otherwise would allow a party to undermine the *Franks* test merely by submitting an affidavit contradicting her own prior testimony after the party's counsel chose not to cross-examine her as a witness.  Similar to *Cubie*, in this case, defense counsel repeatedly asked Juarez about key components of her complaint—the central issues of the case.  In fact, defense counsel appeared to be basing questions on the plaintiff's complaint itself, at times quoting directly from it.[28]

Next, the information in the affidavit is not based on newly-discovered evidence.  Plaintiff's counsel argues Juarez did not have access to some of the affidavit evidence at the time of the deposition because she did not have her notes in her physical possession when she was deposed.  This argument misses the point.  Having "access to the evidence" does not require the deponent to hold her notes in her hands while she testifies.  Juarez indicated she wrote the notes at issue prior to the deposition, so she certainly had access to the information they supposedly contained.  More important, Juarez was a party to the alleged conversations to which the affidavit refers.  Plaintiff's counsel also implies some of the evidence in the affidavit may be newly-

---

[26]*Id.* at *3–4.

[27]*Id.* at *3.

[28]*See, e.g.*, Juarez Memo. in Opposition to Sum. Judg., Docket No. 66, Ex. D, at 168–70, 180–82, 184, 243, 245–46 (July 14, 2006) (Margarita Juarez Examination Under Oath).

discovered, in that it relates to incidents occurring after Ms. Juarez's deposition.  The court only

sees one such reference—an indication that on February 18, 2006, Ms. Juarez told a manager she

would seek relief outside of the organization.  This reference has no material effect on the

summary judgment evaluation.

Juarez's deposition testimony also does not reflect confusion sufficient to justify material

alteration.  In her affidavit, Juarez explained she could not remember some details of events at

the time of her deposition because she "felt under pressure."[29]  However, as the court recognized

in *Cubie*, it is likely most deponents feel some pressure while testifying.  Further, in her

deposition, Juarez expressed no confusion on the points the affidavit addresses, and her

testimony does not create confusion for the reader.  The sole example of confusion plaintiff's

counsel provides relates to Juarez's deposition statements that she did not remember the specific,

negative comments people had made about her.  Juarez's claim she did not remember the

comments at the time of her deposition simply does not evince sufficient confusion to require

later affidavit evidence for clarification; rather, it points to an inability to recall.  But Juarez had

multiple chances to correct any confusion or inability to recall in a timely fashion after she gave

her deposition.  For example, Juarez could have supplemented her deposition if, upon review,

she found any answers to be incorrect.  The court reporting service sent plaintiff's counsel a copy

of Juarez's affidavit on October 18, 2005, along with instructions to make any changes and return

it within thirty days.  After receiving no response, the court reporting service again sent a copy of

the affidavit and instructions on December 14, 2005.  Again, plaintiff's counsel failed to respond.

On January 4, 2006, defense counsel sent plaintiff's counsel a request for production of

---

[29]Juarez Affidavit in Opposition to Sum. Judg., Docket No. 67, at ¶ 34 (July 14, 2006).

documents in reference to notes Juarez indicated she kept.  Juarez refused to provide the notes to defense counsel, claiming they constituted privileged information.  Not only did Juarez fail to respond to any of these opportunities to correct her testimony, she made no independent efforts to do so.

Finally, Juarez's timing in executing this affidavit gives the court pause.  Juarez gave her deposition testimony on October 5, 2005, at a time when the incidents would have been more fresh in her memory.  Juarez did not execute her affidavit until over nine months later — interestingly, on the same day she filed her memorandum in opposition to the defendant's motion for summary judgment.  This timing places the defendant at a disadvantage, depriving Family Dental of any chance to pursue discovery on the subjects covered in the affidavit.

The court finds Juarez's affidavit cannot be seen as simple clarification of her earlier deposition testimony.  Instead, it constitutes a sham affidavit filed in order to create an issue of material fact.  The court, therefore, excludes the entire affidavit.  It is not feasible to exclude only parts of the affidavit because the deposition offers no support for the vast majority of the affidavit.  Further, the portions of the affidavit consistent with the deposition are too enmeshed with unsupported assertions to allow the court to reasonably parse through and redact only the groundless portions.  As but one example this enmeshment, paragraph two of Juarez's affidavit asserts: "On February 13, 2004, I was transferred to Defendant's Ellis Ship location to accommodate Dr. Schlotman."[30]  The record evidence does support that Family Dental transferred Juarez to the Ellis Ship clinic.  But the statement as a whole is misleading; Juarez was only transferred there for three days, the first day of the transfer was February 11, 2004, and the

_____

[30]Juarez Affidavit in Opposition to Sum. Judg., Docket No. 67, at ¶ 2 (July 14, 2006).

transfer was to accommodate Juarez's desire to not work with Schlotman again—not to accommodate Schlotman.  To try to redact only the contradictory parts of the affidavit would be an impossible task.  Accordingly, the court GRANTS the defendant's motion to exclude the affidavit in its entirety.

### III.  Defendant's Motion for Summary Judgment

For clarity of the record, in the summary judgment analysis, the court will consider the evidence in record before it, but will disregard the statements in Juarez's affidavit as inconsistent with her deposition testimony.  Viewing the remaining evidence before the court in the light most favorable to Juarez, the court finds Juarez's claims of retaliation, disparate treatment, *quid pro quo* sexual harassment, and hostile environment based on race and gender fail, as a matter of law. The court will address each claim, in turn.

#### A.  Retaliation

Title VII makes it unlawful for an employer "to discriminate against any of [its] employees . . . because [the employee] has opposed any practice made an unlawful employment practice . . . ."[31]  In the absence of direct evidence of retaliation, the court assesses claims under the *McDonnell Douglas* burden-shifting framework.[32]  Both parties concede this framework applies to Ms. Juarez's retaliation claim.  Under this burden-shifting structure, the plaintiff must first establish a prima facie case of retaliation, then, the burden shifts to the employer to

---

[31]42 U.S.C. § 2000e-3(a).

[32]*Medina v. Income Support Div.*, 413 F.3d 1131, 1135 (10th Cir. 2005).

articulate a legitimate, nondiscriminatory reason for the adverse employment decision.  From there, the burden returns to the plaintiff to show the stated reason is pretextual.[33]

To establish a prima facie case of retaliation, a plaintiff must show "(1) that he engaged in a protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action."[34]  Under the anti-retaliation provision, employer actions must be "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination."[35]  "The anti-retaliation provision seeks to prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms. . . . And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence."[36]  Although most of the conduct to which Juarez objects occurred after she engaged in protected opposition to discrimination, she failed to show a reasonable employee would have found the actions materially adverse.  Further, the record evidence falls short of showing Family Dental orchestrated, condoned, or encouraged any co-worker harassment Juarez suffered such that Family Dental could be held liable for it.

### 1. Engaging in Protected Opposition

Juarez provided the court with evidence sufficient to satisfy the first prong of the test for retaliation regarding much of the conduct she describes.  Juarez engaged in protected activity by

---

[33]*Trujillo v. Univ. of Colo. Health Scis. Ctr.*, 157 F.3d 1211, 1215 (10th Cir. 1998).

[34]*Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2415 (2006))

[35]*White*, 126 S. Ct. at 2409.

[36]*Id.* at 2415.

making a sexual harassment complaint to Family Dental in January 2004.  The defendant argues

actions Juarez claims constituted retaliation for her DOPL complaints cannot be viewed as

retaliation because Juarez's DOPL complaint did not constitute protected activity.  However, the

record contains nothing by which the court can dissect actions based on the DOPL complaint

versus actions based on the initial complaint and, in this case, it does not make sense for the

court to construct this seemingly artificial barrier.  Viewing the evidence in the light most

favorable to the plaintiff, the court finds even if the complaint to DOPL did not constitute

protected activity, any actions targeting the plaintiff after her initial sexual harassment complaint

may have been spurred by her initial complaint.  All retaliatory conduct Juarez alleges occurred

after her initial, protected complaint and will be considered for purposes of summary judgment,

except for one act, which occurred before Juarez filed her complaint.

Juarez alleges Hight's statement—that she could contact legal counsel, accompanied by a

request not to do so until after Family Dental investigated internally—to be retaliatory.  This

claim fails at the outset because Hight made this request when she confronted Juarez about

Schlotman's complaint against Juarez.  Only later did Juarez complain to Palmer about

Schlotman.  Until she first made that complaint, she had not engaged in conduct protected by this

provision.

        2. Materially adverse action

Although the other conduct Juarez alleged occurred after she complained about

Schlotman, the record evidence fails to satisfy the second prong of the test for retaliation—that

Family Dental took action against Juarez a reasonable employee would find materially adverse.

Juarez contends the actions against her, taken together, were sufficiently severe as to constitute

retaliatory harassment.  Even taken together, though, the court cannot conclude Juarez faced

harassment severe enough to dissuade a reasonable person from complaining.  The Supreme

Court first articulated this "reasonable employee" test for retaliation in June 2006,[37] and as of yet,

there is minimal guidance on its application.  However, consistent with this court's approach in

*EEOC v. Body Firm Aerobics, Inc.*,[38] the court will look to the body of law on adverse

employment action in substantive Title VII claims as instructive of what a reasonable person

would find to constitute adverse action for retaliation purposes.

Under Title VII, to constitute adverse employment action, the employer's conduct must

adversely affect an employee's job status.[39]  "Although [the court] will liberally construe the

phrase adverse employment action . . . the action must amount to 'a significant change in

employment status, such as hiring, firing, failing to promote, reassignment with significantly

different responsibilities, or . . . causing a significant change in benefits."[40]  "Mere

inconveniences or alterations of job responsibilities do not rise to the level of an adverse

employment action."[41]  These articulations provide guidance even under the Supreme Court's

new test for retaliation.  For example, it is not reasonable to think an individual would find "mere

inconvenience" or derogatory comments sufficient to dissuade her from filing a complaint.  But,

---

[37]*See id.* at 2405.

[38]2006 U.S. Dist. LEXIS 48128 (D. Utah July 13, 2006).

[39]*Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1213 (10th Cir. 2003).

[40]*Stover v. Martinez*, 382 F.3d 1064, 1071 (10th Cir. 2004) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).

[41]*Id.* at 1071.

a reasonable complainant would likely find an action which significantly changes her

employment status to be an adverse employment action.

(a) Changes in Job Duties and Status

The evidence in the record falls short of supporting Juarez's claim her job duties changed

in any materially adverse way after her return from administrative leave. Although a "significant

change in employment responsibilities may rise to the level of an adverse employment action,"[42]

the changes Ms. Juarez faced were anything but significant. In *EEOC v. Body Firm Aerobics,*

*Inc.*, this court granted the employer's motion for summary judgment on the plaintiff's claims she

lost the authority to hire and fire individuals after she lodged a sexual harassment complaint

against her supervisor.[43] The court commented on the vagueness of the plaintiff's allegations and

found any job changes were not materially adverse.[44] The court distinguished *White*, where the

Supreme Court found materially adverse action because the challenged job changes carried less

prestige, were "more arduous and dirtier," and objectively equated to a worse job.[45]

Juarez alleges when she returned from administrative leave, she was made a permanent

runner and she received an amended job performance plan which deprived her of the ability to

supervise other dental assistants. These claims are not borne out by the record. Like the

complainant in *Body Firm*, Juarez provided few, if any, details of what supervisory

responsibilities she believed she possessed or how these duties changed. Juarez indicated only

---

[42]*Stover*, 382 F.3d at 1074.

[43]2006 U.S. Dist. LEXIS 48128, at *14, 22.

[44]*Id.* at *22.

[45]*Id.* (citing and quoting *White*, 126 S. Ct. at 2417).

that, at some point, she returned to her normal duties of solving problems and giving doctor

assistant assignments; thus, the court infers Juarez believes she lost these specific supervisory

duties.  But Juarez admitted Palmer assured Juarez her duties had not changed.  Further, Palmer

explained that as of January 2004, the individual who made the schedules varied—it was not

Juarez exclusively, although she was involved in the overall process.  Palmer never removed this

responsibility from her; in June 2004, when clinic employees began working five, ten-hour shifts,

the dentists, Palmer, and Juarez collaboratively worked to arrange an acceptable schedule.  With

regard to changes in non-supervisory duties, Juarez claims Palmer told her she would no longer

assist doctors.  But Juarez belies this claim as well as her claim she was assigned as a "permanent

runner" by admitting she still worked as a chairside assistant more than once a week after her

return from administrative leave and that part of her duties as Dental Assistant II were to run the

clinic.  Juarez further undercuts her claim by conceding she often assigns herself to run the clinic

because it allows her to oversee the whole picture better and she feels like she is more productive

in that position.  Dental Assistant II's, who act in this runner capacity, earn higher pay than most

Dental Assistant I's, and Juarez admitted being a Dental Assistant II is a more demanding job.

Unlike the plaintiff in *White*, therefore, Juarez presented no evidence acting as a runner is any

less prestigious or "more arduous and dirtier"[46] than any of her other duties as a Dental Assistant

II.  In fact, she implied she prefers runner duties and in some ways, these duties carry more

prestige.

   As further evidence her job duties changed, Juarez points out Palmer offered her a

position as a front-desk receptionist and her job title stopped appearing on her pay stubs.

---

[46]*White*, 126 S. Ct. at 2417.

Nothing in the record shows these actions were anything more than inconvenient, at most. Palmer's offer to make Juarez a receptionist does not constitute retaliation, as a matter of law. Juarez turned down Palmer's offer and was never made a receptionist. At most, this equates to a failed attempt by Palmer to change Juarez's job duties. Additionally, Juarez admitted knowing the reason her title stopped appearing on her paycheck — a computer problem. Due to this widespread computer problem, many state employees suffered the same inconvenience for the same time period. A system-wide problem does not to constitute actionable retaliation against Juarez.

Last, it is important to note Juarez has effectively continued her employment with Family Dental at all times since first being hired. Neither her pay nor her benefits have decreased, and she has not been disciplined or demoted. A jury could not reasonably conclude Juarez's position, status, or responsibilities changed in any materially adverse way.

(b) Temporary Transfer and Placement on Administrative Leave

Juarez's claims her transfer and placement on administrative leave constituted retaliation also fail. Family Dental transferred Juarez from the Salt Lake clinic to the Ellis Ship clinic from February 11 through February 13, 2004, to keep her from having to work with Schlotman, who was scheduled to see patients at the Salt Lake location on those dates. In one breath, Juarez complains Hight told her she would have to work one-on-one with Schlotman again; in another breath, she complains about Family Dental temporarily transferring her to avoid that situation. Juarez presented no evidence she ever had to work with Schlotman after the trip to Bicknell.

And  Juarez admitted she did not see "how [that transfer] could be harassment."[47]  The transfer was for an extremely short period of time, appears reasonable given the conflicting claims that faced Family Dental, and complied with Juarez's own request she not be made to work with Schlotman.  Further, it did not affect her salary or benefits.  In the eyes of a reasonable employee, this transfer could not be materially adverse.

More than a month after Juarez lodged her sexual harassment complaint and just one week after Family Dental learned Juarez complained to DOPL, Family Dental placed her on paid administrative leave.  Family Dental placed Schlotman on leave the same day, pending completion of the internal investigation.  Juarez presents no evidence tending to show this action constituted retaliation instead of an effort to get to the bottom of conflicting allegations.  Juarez also presents no evidence the placement on paid leave was harmful, as required by the Supreme Court in *White*.[48]  Such an act could not constitute a materially adverse action to a reasonable employee, especially in light of Family Dental's need to investigate the competing sexual harassment complaints of Juarez and Schlotman.

(c) Threat of Termination and Selective Enforcement of Policies

Juarez claims it constituted a materially adverse action for Shelly Miles, a member of Family Dental management, to tell Juarez she would jeopardize her job if she talked about her complaint against Schlotman or Schlotman's history.  This claim fails, as the "verbal threat of being fired is not an 'ultimate employment decision' and does not 'rise above having a mere

---

[47]Family Dental Memo. in Support of Sum. Judg., Docket No. 59, Ex. A, at 91 (June 6, 2005) (Margarita Juarez Examination Under Oath).

[48]*White*, 126 S. Ct. at 2417.

tangential effect on a possible future employment decision.'"[49]  Miles' exchange with Juarez did not even amount to a threat of termination. To put it in context, Miles told Juarez bringing up Schlotman's prior criminal records in the workplace would jeopardize her job because it could be considered retaliation on her part for the sexual harassment complaint Schlotman made against her.  Considering that Miles' warning was clearly designed to further the goals of Title VII, not thwart them, it can not be deemed retaliation.

The record also does not support Juarez's claim Family Dental retaliated against her by selectively enforcing its policies.  Upon return from administrative leave, management personnel reminded Juarez she could not wear her scrubs to lunch, she could not use her cellular phone in the office, she could not park in the front of the building, and she needed to enter through the rear door.  Although each of these reminders reflects an official Family Dental policy, Family Dental enforced none of the policies regularly before placing Juarez on leave.  After Juarez returned from leave, Family Dental reminded all employees of the policies but Juarez believed it to be retaliation that she was reminded first.  Plaintiff's counsel tried to bolster Juarez's speculation that Family Dental failed to enforce it policies against other employees by citing Guimond's deposition, but the court cannot reasonably draw a supportive inference from the one page of Guimond's testimony provided.  Guimond merely said the policy of not wearing scrubs to lunch is supposed to be enforced and is brought up at staff meetings as a reminder, but he had never personally been involved in a counseling session with anyone regarding it.  Neither this statement nor the record evidence is sufficient to support Ms. Juarez's claim of selective enforcement.

(d)  Co-worker Harassment

---

[49]*Seely v. Runyon*, 966 F. Supp. 1060, 1064 (D. Utah 1997).

"[C]o-worker hostility or retaliatory harassment, if sufficiently severe, may constitute 'adverse employment action' for purposes of a retaliation claim."[50]  However, an employer may only face liability for co-workers' retaliatory harassment where "its supervisory or management personnel either (1) orchestrate the harassment or (2) know about the harassment and acquiesce in it in such a manner as to condone and encourage the co-workers' actions."[51]

In this case, evidence of Juarez's fellow employees pulling away from her and treating her coldly fails to support an inference of actionable retaliation.  Specifically, Juarez felt harassed by the allegedly cold behavior of Case, Vekter, and Palmer.  The record shows only that these employees interacted less with Juarez and made occasional rude comments to her or about her.  While it was no doubt unpleasant for Juarez to face snide comments and the cold shoulder, "normally petty slights, minor annoyances, and simple lack of good manners"[52] are not actionable under Title VII.  Although undesirable, this type of shunning and rejection by co-workers is not sufficiently severe to interfere with Juarez's access to Title VII's remedial mechanisms in any meaningful way.

Juarez allegedly suffered the most egregious harassment at the hands of Guimond, a co-worker.   As offensive as it may have been to be pushed against a wall, followed around, and monitored by Guimond, the record fails to support an inference Family Dental knew of Guimond's conduct or condoned it in any way.  There is no evidence Juarez complained of his alleged behavior or Family Dental management had any other reason to know it had occurred.

---

[50]*Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1264 (10th Cir. 1998).

[51]*Gunnell*, 152 F.3d at 1265.

[52]*White*, 126 S. Ct. at 2415.

Juarez characterizes a comment by Palmer as evidence that Family Dental supported the co-worker harassment.  This is not a reasonable inference.  Juarez complained to Palmer co-workers were pulling away from her, and Palmer responded by telling her "that's okay, that's the way how things are going to be after DOPL has set foot in here."[53]  Juarez's generic report would not have put Palmer on notice of specific harassment by Guimond, and Palmer's response can be most reasonably seen as an observation employee interactions inevitably change when a licensing agency begins investigating a case.  Palmer's observation "[t]here was definitely a difference"[54] in how Juarez was treated following her complaint can be most fairly interpreted in much the same way, especially since Palmer ascribed some of the difference in treatment toward Juarez to Juarez's own altered behavior.  It is not reasonable to assume either of Palmer's comments reflected knowledge of specific incidents of harassment directed at Juarez.

Finally, the letters the dentists wrote fail to support an inference of co-worker harassment.  The dentists wrote one letter to Family Dental and another to DOPL, addressing the dentists' licensing concerns due to the DOPL complaint.  However, there is no indication Juarez knew of this letter until the defense produced it in discovery, and it is not possible for Juarez to feel harassed by a letter of which she had no knowledge.  Juarez never mentioned the letter in her deposition, and at the hearing on the summary judgment motion, plaintiff's counsel conceded the letter alone would not constitute retaliation.  That Family Dental recommended the dentists put their concerns in writing does not lend to an inference Family Dental orchestrated negative

---

[53]Family Dental Memo. in Support of Sum. Judg., Docket No. 59, Ex. A, at 142 (June 6, 2005) (Margarita Juarez Examination Under Oath).

[54]Family Dental Memo. in Support of Sum. Judg., Docket No. 59, Ex. D, at 57 (June 6, 2005) (Mark Palmer Examination Under Oath).

conduct targeting Ms. Juarez.  Unless Juarez knew of the letter or Family Dental management used it to harass her, which the record does not support, the court misses the significance of the letter.

Ultimately, the record fails to support an inference Family Dental orchestrated or had knowledge of co-worker harassment targeting Juarez sufficient to impute liability to Family Dental.  After *White*, a person may suffer actionable retaliation even without suffering a tangible employment action,[55] but Juarez's allegations are insufficient to establish actionable retaliation.  A jury would not reasonably find the actions Juarez alleges, even in totality, would have dissuaded a reasonable employee from making a complaint.

### 3.  Causal connection

To meet the final prong of the test for retaliatory harassment, the plaintiff must prove "that a causal connection existed between the protected activity and the materially adverse action."[56]  This requires proof that "the defendant's action was intentionally retaliatory."[57]  There is insufficient evidence in the record to find Family Dental's actions were intentionally retaliatory.  Based on this and the fact Juarez has not shown Family Dental took materially adverse action against her, the court cannot find a causal connection existed.

Even in aggregate, Ms. Juarez's evidence of retaliation by Family Dental fails to meet the *White* standard.  Instead, it shows that she carried out her workdays in basically the same manner she always had.  Based on this finding, there is no need for the court to evaluate

---

[55] *See White*, 126 S. Ct. at 2415.

[56] *Argo*, 452 F.3d at 1202 (citing *White*, 126 S. Ct. at 2415).

[57] *Gunnell*, 152 F.3d at 1253.

nondiscriminatory reasons offered in support of Family Dental's actions or whether any such reasons are pretextual.  The court grants the defendant's motion for summary judgment as it relates to Ms. Juarez's retaliation claim.

    *B.  Disparate Treatment*

    Juarez also alleges she was disparately treated based on her race or her gender.  Under a disparate treatment theory, the plaintiff must show she was treated in a way that "but for" her race or gender would have been different.[58]  If the plaintiff only submits circumstantial evidence of her employer's discriminatory intent, the court assesses her claim under the *McDonnell Douglas* burden-shifting framework.  To establish a prima facie case of disparate treatment, the plaintiff must show (1) she is a member of a protected class, (2) she suffered an adverse employment action, and (3) similarly situated employees were treated differently.[59]  Some courts use a four-part test, but adverse employment action, the key component of the inquiry before the court, is a necessary part of both tests.[60]  "Proof of discriminatory motive is critical" to a disparate treatment claim.[61]  Although this proof can be based on circumstantial evidence, "[n]ot every difference in treatment . . . will establish a discriminatory intent."[62]  "Title VII does not make unexplained differences in treatment per se illegal nor does it make inconsistent or

---

[58]*L.A. Dep't of Water v. Manhart*, 435 U.S. 702, 711 (1978).

[59]*Trujillo*, 157 F.3d at 1215.

[60]*Ford v. Am. Airlines, Inc.*, 2006 U.S. Dist. LEXIS 57129, at *38-39 (D. Okla. Aug. 10, 2006); *see also Kendrick v. Penske Transp. Svcs., Inc.*, 220 F.3d 1220, 1227 n.6 (10th Cir. 2000).

[61]*Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 334 n.15 (1977)).

[62]*Kendrick*, 220 F.3d at 1232.

irrational employment practices illegal.  It prohibits only intentional discrimination based upon an employee's protected class characteristics."[63]

Juarez presented evidence sufficient to satisfy only the first element of a prima facie case of disparate treatment.  Juarez is Hispanic and she is female, which makes her a member of a protected class.  However, Juarez's claim fails on each of the next two grounds.

First, Juarez failed to present evidence she suffered an adverse employment action.  The anti-retaliation provision provides "broader protection for victims of retaliation than for those whom Title VII primarily seeks to protect."[64]  It only covers employer actions materially adverse to a reasonable employee,[65] while under Title VII, the action must amount to "'a significant change in employment status'"[66] to be considered adverse. As discussed previously, Juarez's claim fails even under the broader anti-retaliation test for adverse action, therefore, it fails under Title VII's even stricter standard for adverse action.  Schlotman's harassment of Juarez based on her gender and race fails to support an inference of gender- or race-based treatment by Family Dental.  The court reaches this conclusion, in part, because the record does not show Schlotman acted on behalf of Family Dental when harassing Juarez or that he qualifies as Juarez's employer.  Additionally, the record does not support an inference discriminatory motive based on Juarez's race or gender lurked beneath any actions Family Dental took.

---

[63]*EEOC v. Flasher*, 986 F.2d 1312, 1319 (10th Cir. 1993).

[64]*White*, 126 S. Ct. at 2414.

[65]*Id.* at 2409.

[66]*Stover*, 382 F.3d at 1071 (quoting *Ellerth*, 524 U.S. at 761).

Next, the record does not support an inference Schlotman was situated similarly with Juarez or was treated significantly differently.  To determine if employees are similarly situated, the court must look at the relevant employment circumstances.  First, Schlotman's position as a dentist is significantly different than Juarez's position as a Dental Assistant II.  There is no evidence Schlotman and Juarez had the same immediate supervisor.  Further, even though Schlotman complained about Juarez first, Family Dental placed him on paid administrative leave along with Juarez.  No evidence supports an inference Family Dental considered either complaint to carry greater significance— Family Dental investigated both complaints and failed to substantiate both.  Juarez points out Schlotman's job, duties, and pay remained the same after she lodged a complaint against him.  As discussed previously, Juarez's job and pay also remained the same, and her duties did not change in any significant fashion.  A reasonable jury would find, therefore, Juarez made no showing she was treated differently in any notable way.

Because Juarez has not made out a prima facie case under the theory of disparate treatment, the court does not address whether the Family Dental has met its burden by articulating a legitimate, nondiscriminatory reason for any actions it took or whether Juarez has shown such explanation to be pretextual.  The court grants the defendant's motion for summary judgment on this claim.

### C.  Quid Pro Quo *Sexual Harassment*

An employer violates Title VII if it takes actions on the basis of sex, "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment."[67]  To establish she suffered *quid pro quo* sexual harassment, a plaintiff must show

---

[67]42 U.S.C. 2000e-2(a)(1).

"tangible job benefits are conditioned on an employee's submission to conduct of a sexual nature and that adverse job consequences result from the employee's refusal to submit to the conduct."[68] Unfulfilled threats of tangible employment action are better characterized as hostile environment claims.[69]  Employers are liable for *quid pro quo* sexual harassment by supervisors because the supervisor "wields the employer's authority to alter the terms and conditions of employment."[70] "Only a supervisor of an employee may commit *quid pro quo* sexual harassment because only a supervisor has authority to alter the terms and conditions of an employee's employment."[71]

In this case, the record fails to disclose any suggestion made to Juarez conditioning her employment or any related benefits, either explicitly or implicitly, on acquiescing to Schlotman's advances.  Schlotman allegedly offered to pay Juarez $100 for sexual favors.  This proposition, while repulsive, was void of any suggestion Juarez's position or benefits at Family Dental could be enhanced if she acquiesced or lessened if she refused.  In other words, Schlotman allegedly proposed a *quid pro quo* between himself and Juarez — not between Family Dental and Juarez. The necessary link between any negative consequences suffered by Juarez and her refusal to acquiesce cannot be inferred from the record.  Further, this is not a case where Juarez suffered an unfulfilled threat of tangible employment action.  This is a case where no threat was made at all. Plaintiff's counsel points to an "implicit threat" of negative consequences based solely on Dr. Schlotman's status as a dentist and on his angry, insulting behavior on the return trip from

---

[68]*Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1414 (10th Cir. 1987).

[69]*See Ellerth*, 524 U.S. at 753–54.

[70]*McPherson v. HCA-HealthOne, LLC*, 202 F. Supp.2d 1156, 1168 (D. Colo. 2002); *see also Ellerth*, 524 U.S. at 753–54.

[71]*McPherson*, 202 F. Supp.2d at 1169.

Bicknell.  This implicit threat is insufficient to meet this prong; otherwise, employers would be liable for all supervisor harassment as supervisors necessarily have greater status.[72]  "[A] supervisor's power and authority invests his or her harassing conduct with a particular threatening character."[73]  Nonetheless, this status alone is insufficient to impute liability to employers for all supervisor conduct.[74]  Similarly, Schlotman's status as a dentist is insufficient to impute liability to Family Dental.  This is especially true where Schlotman occupied no supervisory position over Juarez.

Even if Juarez had been subject to *quid pro quo* harassment, therefore, Family Dental would not face liability for Schlotman's actions because Schlotman did not occupy a supervisory position over Juarez — he had no power to use employment actions to reward or punish her. The functional question in assessing supervisory status is whether the harasser "had sufficient control over the plaintiff to be considered her supervisor."[75]  *McPherson v. HCA-HealthOne, LLC*[76] is instructive here.  In *McPherson*, the court found a doctor did not qualify as supervisor of a nurse, even where the doctor supervised the nurse during surgery and provided feedback regarding her work.  This was because the doctor possessed no authority to directly affect the terms and conditions of the nurse's employment.  The court concluded "[a]t best, one might suggest [the physician] possessed certain 'non-supervisory authority' over plaintiff.  'However, the mere

---

[72]*See Ellerth*, 524 U.S. at 760.

[73]*Id.* at 763.

[74]*Id.* at 763–64.

[75]*Wright-Simmons v. City of Okla.*, 155 F.3d 1264, 1271 (10th Cir. 1998).

[76]*McPherson v. HCA-HealthOne, LLC*, 202 F. Supp.2d 1156, 1168 (D. Colo. 2002).

delegation of non-supervisory authority to [a person] does not give rise to employer liability . . . .'"[77]

As with the physician in *McPherson*, Schlotman possessed no authority to directly affect any terms or conditions of Juarez's employment, even if he possessed non-supervisory authority over her dental work.  No evidence shows Schlotman at any time had authority over Juarez's hiring, firing, assignments, discipline, or other employment conditions.  Hight hired Juarez, and Palmer acted as her direct supervisor.  Palmer gave Juarez her work assignments and Palmer authorized her to travel to Bicknell.  Juarez admitted knowing dentists had no supervisory authority over dental assistants at Family Dental and admitted no one at Family Dental told her Schlotman held supervisory authority over her.  Four times, she even referred to Schlotman as a "co-worker" in the Charge of Discrimination she filed with the Utah Anti-Discrimination and Labor Division on July 14, 2004 — not once did she refer to him as her supervisor.

However, Juarez claims Palmer placed Schlotman in a position of apparent supervisory authority over her when he sent them on the trip together, with no management personnel present.  She implies Schlotman's agency relationship with Family Dental aided him in the accomplishment of his offensive behavior because he would not have been in Bicknell with Juarez but for his job.  However, an employment relationship itself is not enough to establish an "aided in agency relation" standard.[78]  This is because "[i]n a sense, most workplace torfeasors are aided in accomplishing their tortious objective by the existence of the agency relation."[79]

---

[77]*McPherson*, 202 F. Supp.2d at 1169 (quoting *Hirschfeld v. N.M. Corrs. Dep't*, 916 F.2d 572, 580 n.7 (10th Cir. 1990)).

[78]*Ellerth*, 524 U.S. at 759.

[79]*Id.*

Juarez's belief Schlotman occupied a supervisory position on the trip by virtue of his position as a dentist and the very fact of the trip is not reasonable.  Schlotman did not hold supervisory authority over Juarez at other times, and no evidence suggests he possessed any such authority on the trip.

The court grants summary judgment to the defendant on Juarez's *quid pro quo* claim as Juarez has failed to present evidence to support the elements of *quid pro quo* harassment and failed to show Schlotman possessed supervisory authority over her.

### D.  Gender- and Race-Based Hostile Environment

Juarez also claims racial and sexual discrimination created a hostile or abusive work environment in violation of Title VII.  Although the court recognizes race- and gender-based hostile work environment as separate claims, for summary judgment purposes, the court chooses to assess these claims together.  This approach is appropriate because the elements and defenses of race- and gender-based hostile environment claims mirror each other and the court "can aggregate evidence of racial hostility with evidence of sexual hostility to establish a hostile work environment."[80]

To survive summary judgment on a race or sex discrimination claim, the court must find support in the record for an inference of a racially or sexually hostile work environment and must find a basis for employer liability.[81]  A plaintiff can only maintain a hostile environment action under Title VII if "the harassment was pervasive or severe enough to alter the terms, conditions,

---

[80]*Smith v. Norwest Fin. Acceptance*, 129 F.3d 1408, 1413 (10th Cir. 1997); *see also Hicks*, 833 F.2d at 1414.

[81]*Trujillo*, 157 F.3d at 1214 (quotations omitted).

or privilege of employment" and the harassment was based in race or gender animus.[82]  Such

workplace conduct is assessed "by 'looking at all the circumstances,' including the 'frequency of

the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a

mere offensive utterance; and whether it unreasonably interferes with an employee's work

performance."[83]  Severity and pervasiveness must be judged objectively and subjectively.[84]  The

evaluation includes gender- and race-neutral conduct, as long as the factfinder can reasonably

infer the conduct was related to gender or race.[85]  "[A] few isolated incidents of racial enmity are

insufficient to survive summary judgment."[86]  The discrimination must be the employer's

"standard operating procedure — the regular rather than the unusual practice."[87]

In this case, any factual dispute is immaterial because if an abusive work environment

existed, it did not alter the conditions of Juarez's employment.  Further, there is no legitimate

basis for holding Family Dental liable for much of the objectionable behavior.  Juarez offers the

same allegations in support of her hostile environment claim as she offered in support of her

retaliation claim.  And just as a reasonable jury could not find the conduct to be materially

adverse for retaliation purposes, a reasonable jury could not find it to be so severe or pervasive as

to alter the conditions of Juarez's employment or impede her ability to do her job.

---

[82]*Id.* (quotations omitted).

[83]*Clark County Sch. Dist v. Breeden*, 532 U.S. 268, 270–71 (2001) (quoting *Faragher v. Boca Raton*, 524 U.S. 775, 787-88 (1998)).

[84]*O'Shea v. Yellow Tech. Svcs., Inc.*, 185 F.3d 1093, 1097 (10th Cir. 1999).

[85]*Id.*

[86]*Trujillo*, 157 F.3d at 1214.

[87]*Pitre v. W. Elec. Co., Inc.*, 843 F.2d 1262, 1267 (10th Cir. 1988).

Further, it is not reasonable to infer the conduct stemmed from racial or gender animus by Family Dental.  While Juarez may disagree with how Family Dental treated her, absent a showing any negative treatment was *due to her race or gender*, her disagreement is not actionable under Title VII.  Not only is there no independent basis to infer Family Dental's conduct was based on race or gender, it is not reasonable to infer the sex- and race-related conduct of Schlotman so poisoned Family Dental or its other employees toward Juarez that their conduct arose out of gender- or race-related hostility.[88]  Whatever the case with Schlotman's sex- and race-based motivation, it does not necessarily reflect the motivation of other employees or of Family Dental.  Without some kind of broader extension beyond Schlotman, therefore, this conduct cannot support Juarez's hostile environment claim.

Even when considered in light of the additional evidence Juarez recites, a reasonable jury could not find Juarez faced a hostile environment.  Although based on race and sex, no reasonable person could believe Schlotman's treatment of Juarez in Bicknell, demeaning and offensive though it may be, was so severe or pervasive as to alter the conditions of Juarez's employment — particularly given Family Dental's quick and strong response to the allegation.  Also, Schlotman's racially derogatory comments on the way back from Bicknell, Vekter's statement Family Dental management would not believe Juarez because of her race, and Hight's questions about Juarez's accent and background collectively only qualify as a "few isolated incidents,"[89] at most.  Nothing in the record supports finding Juarez to be a victim of on-going mistreatment because of her race or gender or finding discrimination to be Family Dental's

---

[88]*See Chavez v. New Mexico*, 397 F.3d 826, 837 (10th Cir. 2005) (noting it is a great inferential leap to impute the harasser's motive to the gender-neutral conduct of co-workers).

[89]*Trujillo*, 157 F.3d at 1214.

"standard operating procedure."[90]  Further, the evidence could not convince a reasonable person the terms and conditions of Ms. Juarez's employment were altered.

Moreover, a jury could not reasonably find Family Dental liable for the race- and sex-based conduct of Schlotman and Juarez's other fellow employees.  An employer will be liable if its supervisory personnel harassed subordinates and the harassment resulted in a tangible employment action, even if the employer stopped further harassment.[91]  As discussed in conjunction with the *quid pro quo* claim, the record does not show Schlotman occupied a supervisory position over Juarez.  Based on this finding, the court sees no need to further explore this issue or to address the possibility of a *Faragher* defense.[92]

As plaintiff's counsel points out, a basis for employer liability also exists when an employer is negligent or reckless.  To support a claim Family Dental negligently allowed supervisors and employees to harass Juarez, Juarez must show Family Dental "had actual or constructive knowledge of the hostile work environment but did not adequately respond to notice of the harassment."[93]  To show actual knowledge, Juarez must establish she reported the harassment to Family Dental management personnel.[94]  To show constructive knowledge, Juarez must establish the harassment was "so egregious, numerous, and concentrated as to add up to a

---

[90]*Pitre*, 843 F.2d at 1267.

[91]*Gunnell*, 152 F.3d at 1261.

[92]*See Faragher*, 524 U.S. at 787–88.

[93]*Adler*, 144 F.3d at 673; *see also* 29 CFR 1604.11(d).

[94]*Ford v. West*, 222 F.3d 767, 776 (10th Cir. 2000).

campaign of harassment."[95]  This is a greater burden than the burden required to prove a hostile

environment claim.[96]  "To infer employer knowledge from only the level of pervasiveness

essential to make out a hostile environment claim would be illogical because if that were the rule,

knowledge would be attributed to employers in all cases of hostile work environment founded on

pervasiveness."[97]

   The evidence before the court fails to supports an inference Family Dental knew or

should have known of most of the alleged co-worker harassment.  Juarez reported Schlotman's

sexual advances and reported her fellow employees withdrawing from her, but she reported no

other incidents.  Juarez did not even report the race-based comments Schlotman made while

returning from Bicknell.  Additionally, it is not reasonable to infer Family Dental had

constructive knowledge of any other incidents.  The harassment, in aggregate, did not even

measure up to the standard of a hostile environment; it certainly did not add up to a "campaign"

sufficient to impute knowledge to Family Dental.

   Further, a jury could not reasonably hold Family Dental liable for the events Ms. Juarez

actually reported because Family Dental "adequately respond[ed] to notice of the harassment."[98]

Adequacy of response is assessed by asking if the preventative or remedial action was

"reasonably calculated to end the harassment."[99]   "A stoppage of harassment shows effectiveness

---

[95]*Id.*

[96]*Id.*; *see also Adler*, 144 F.3d at 673.

[97]*Ford*, 222 F.3d at 776.

[98]*Adler*, 144 F.3d at 673; *see also* 29 CFR 1604.11(d).

[99]*Adler*, 144 F.3d at 676 (citation and quotations omitted).

which, in turn, evidences such reasonable calculation."[100]  After Juarez lodged a complaint against Schlotman, Schlotman did not harass her again.  Family Dental promptly investigated the complaint and swiftly placed Schlotman on administrative leave — both reasonable measures to prevent future harm to Juarez.  Family Dental accommodated Juarez's request to not work with Schlotman by transferring her to another clinic during a three-day period in which Schlotman would be seeing patients in the Salt Lake clinic.  Approving Juarez's sick leave enabled Juarez to seek medical treatment and allowed her to avoid contact with Schlotman.  Further, despite the fact management personnel told Juarez she would have to work with Schlotman again, the record does not show Juarez ever actually did work with Schlotman after she lodged a complaint. Family Dental also responded adequately to the notice of employees withdrawing from Juarez. As discussed previously, this "shunning" did not constitute actionable harassment, so nearly any response by Family Dental to this complaint would be, and was, adequate.

Because Juarez has not made out a prima facie case of race- or sex-based hostile environment, the court does not address whether Family Dental has met its burden by articulating a legitimate, nondiscriminatory reason for its actions or whether Juarez has shown the reasons to be pretextual. The court grants the defendants' motion for summary judgment as it relates to Juarez's claims of race- and gender-based hostile work environment.

As a final note, the court recognizes plaintiff's counsel alleged numerous other facts and the court has reviewed them.  However, the court finds many of the facts alleged constitute mischaracterizations of record evidence, and many are irrelevant or unsupported by the record.

---

[100]*Id.*

**CONCLUSION**

The court, therefore, GRANTS Family Dental's motion to exclude the affidavit Margarita Juarez submitted with her memorandum in opposition to Family Dental's motion for summary judgment [#72], and GRANTS Family Dental's motion for summary judgment as it pertains to all of Juarez's claims [#58].

SO ORDERED.

DATED this 11th day of September, 2006.

BY THE COURT:

_____
Honorable Paul G. Cassell
United States District Court